FILED IN OPEN COURT

APR - 2 2025

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA

v.

RICKY O'QUINN,

Defendant.

No. 1-25-cr-70

1. International Union, Security, Police and Fire Professionals of America (SPFPA), is a labor organization based in Roseville, Michigan that represents protective security officers at federal workplaces. Pursuant to that representation, SPFPA executed collective bargaining agreements with several employers covering the security industry in several states.

2. Since February 2021, Rick O'Quinn has served as vice-president at large in SPFPA, its second highest position. Prior to that, Rick O'Quinn served as vice-president of Region 2 of SPFPA which covered several states in the southeastern United States. In both those roles, Rick O'Quinn and served as both an officer and employee of SPFPA.

3. Company-1 is an Alabama corporation, with headquarters in Herndon, Virginia, engaged in the business of providing protective security officers at federal workplaces in numerous states. From at least 2010 to 2023, Individual-1 was the president of Company-1.

4. SPFPA represented, sought to represent, and would admit to membership the employees of Company-1. For example, on or about November 2017, Company-1 executed a collective bargaining agreement with SPFPA for term from December 2017 through November 2021 covering private security guards employed by Company-1 in several counties in Southern California. Similarly, on or about April 2018, Company-1 executed a collective bargaining agreement with SPFPA for term from April 2018 through April 2021 covering private security guards employed by Company-1 in Louisiana.

5. Company-2 is a Florida corporation engaged in the business of providing protective security officers at federal workplaces in numerous states. Mabel O'Quinn, the wife of Rick O'Quinn, was the founder, incorporator, and an initial director of Company-2. From its incorporation to the present, Mabel O'Quinn served as Company-2's chief executive officer and president. Rick O'Quinn participated in the finance, budget, decision-making and operations of Company-2 since its inception. Both Rick and Mabel O'Quinn endeavored to hide Rick's involvement in operating Company-2.

6. SPFPA represented, sought to represent, and would admit to membership the employees of Company-2. For example, on or about October 2018, Company-2 executed a collective bargaining agreement with SPFPA for term from October 2018 through October 2021 covering private security guards employed by Company-2 in West Virginia. Similarly, on or about October 2021, Company-2 executed a collective bargaining agreement with SPFPA for term from October 2021 through October 2024 covering private security guards employed by Company-2 in West Virginia.

7. Beginning at least as early as April 2013, and continuing at least through June 2024, Individual-1, acting on behalf of Company-1, agreed to award lucrative subcontracts to supply private security guards at various federal installations in the United States to Company-2. The proceeds from those awards subcontracts from Company-1 to Company-2 to provide security guards totaled tens of millions of dollars. Individual-1 made those awards knowing that Rick O'Quinn was an officer and employee of SPFPA which represented the employees of Company-1, and that Rick O'Quinn was married to Mabel O'Quinn. Rick O'Quinn and Mabel O'Quinn agreed to accept those subcontracts, and their proceeds, on behalf of Company-2.

8. For example, on or about August 2017, Individual-1, on behalf of Company-1, and Mabel O'Quinn, on behalf of Company-2, executed a subcontract whereby Company-2 would supply protective security officers for Company-1 as the prime contractor with United States Department of Homeland Services at federal workplaces in Northern Virginia.

9. Similarly, on or about October 2019, Individual-1 on behalf of Company-1, and Mabel O'Quinn, on behalf of Company-2, executed a subcontract whereby Company-2 as subcontractor would supply protective security officers for Company-1 as the prime contractor with United States Department of Homeland Services, Federal Protective Service at federal workplaces in Louisiana.

10. On or about October 2021, Individual-1, on behalf of Company-1, and Mabel O'Quinn, on behalf of Company-2, executed a subcontract whereby Company-2 would supply protective security officers for Company-1 as the prime contractor with United States Department of Homeland Services at federal workplaces in New England.

11. In 2005, more than five years before the formation of Patronus, Rick and Mabel O'Quinn formed the O'Quinn Family Trust with themselves as trustees. The beneficiaries of the O'Quinn Family Trust were Rick and Mabel O'Quinn. Rick and Mabel O'Quinn opened bank accounts in the name of O'Quinn Family Trust with the Bank of America. Mabel O'Quinn deposited the proceeds from the subcontracts from Company-1 to Company-2, into the bank accounts for the O'Quinn Family Trust at Bank of America. From 2018 to 2023, Company-2 had a gross income of $7,044,722. Rick O'Quinn benefitted from those funds deposited to those accounts from Company-1, using them for his own personal benefit and the benefit of his family.

12. In addition, Mabel O'Quinn deposited her salary as chief executive officer and president of Company-2, totaling more than $4 million from 2015 through 2023 into the bank accounts for the O'Quinn Family Trust at Bank of America. Rick O'Quinn benefitted from the funds deposited to those accounts from Company-2, using them for his own personal benefit and the benefit of his family.

13. Beginning in 2010 when Company-2 was formed, Individual-1 had an unwritten, under-the-table agreement with the O'Quinns that his family would receive 40 percent of the ownership and/or profits of Company-2. From that date forward, Individual-1 would exercise significant hidden influence over many of Company-2's decisions and operations. For example, Individual-1 instructed Company-2 to refrain from bidding on private security contracts, and only to bid in conjunction with Company-1. Individual-1 also instructed Company-2 over which vendors and consultants it would hire and monitored and directed Company-2's finances.

14. In exchange for this hidden 40 percent interest and control of Company-2, Individual-1 directed lucrative subcontracts on behalf of Company-1 as its president to Company-2. Individual-1 also agreed to support Company-2 and ensure that they would be able to win prime contracts. Individual-1's secret intercession of behalf of Company-2 resulted in Company-2 being awarded more than $170 million in contract proceeds as a subcontractor to Company-1, and beginning in April 2015, as a prime contractor with Company-1 as its subcontractor. Both Individual-1 and the O'Quinns understood that any involvement or interest by Rick O'Quinn in Company-2 was also to be kept secret as it would he was prohibited receiving money or things of value from Company-1 or Company-2 as an officer in SPFPA. The payment of 40 percent of Company-2's profits from Mabel and Rick O'Quinn to Individual-1's family was, in part, for the purpose of improperly obtaining and rewarding favorable treatment from Company-1 and Individual-1 in connection with the awarding of prime contracts and subcontracts relating to prime contracts.

15. In January 2015, Individual-1 and another family member (Individual-2) incorporated MCKHU, Inc. Two of Individual-1's other family members (Individual-3 and Individual-4), both Company-1 employees, would thereafter operate a side business under the name, MCKHU, Inc. Individual-1 directed Company-2 to hire MCKHU, Inc. as a consultant to Company-2. On April 1, 2015, Individual-2 on behalf of MCKHU, Inc. and Mabel O'Quinn on behalf of Company-2 executed a consultancy agreement where Company-2 would pay MCKHU, Inc. $195 per hour for service. While the consultancy agreement indicated that MCKHU, Inc. would receive $195 per hour, in fact, they received 40 percent of the profits of the contracts won by Company-1 and Company-2.

16. The table below shows the amount that MCKHU, Inc. billed Company-2 each year for Individual-3 and Individual-4's purported services. Generally, MCKHU, Inc.'s invoices would grossly inflate the hours that Individual-3 and Individual-4 worked and charge $195 per hour, as the parties agreed to in the consultancy agreement. Mabel O'Quinn directed the payments in response to the MCKHU invoices.

| Year | Amount Invoiced | Hours of Work Claimed | Rate |
|------|-----------------|----------------------|------|
| 2016 | $245,000 | 1,400 | $195 |
| 2017 | $732,135 | 3,700 | $195 |
| 2018 | $782,345 | 4,000 | $195 |

17. A portion of the each of those payments from Company-2 to MCKHU, Inc. constituted payments made to Individual-1's family according to the unwritten agreement to provide 40 percent of the ownership and/or profits of Company-2.

18. On January 1, 2019, Mabel O'Quinn, on behalf of Company-2, signed an agreement with a company called Frontline Source for consultancy services at a rate of $225.00 per hour. In August 2019, Individual-1's family incorporated Frontline Source as a vehicle for Individual-1's family to continue to receive payments from Company-2 according to the unwritten, under-the-table agreement to provide 40 percent of the ownership and/or profits of Company-2. In 2019 and 2020, Individual-3 and Individual-4 remained full time employees of Company-1 as well as consultants to Company-2 through Frontline Source. The use of the corporate structure and name, Frontline Source, like MCKHU, Inc. before it, was intended to obscure the fact that Individual-1's family was receiving payments from Company-2.

19. From February to December 2019, Company-2 paid $498,543.35 to Frontline Source—the equivalent of 1,994 hours, or nearly one year of fulltime work. In 2020, Company-2 paid $770,793.75 to Frontline Source. In 2021, Company-2 paid $771,300.00 to Frontline Source. Those payments from Company-2 to Individual-3 and Individual-4 through Frontline Source, Inc., in part, constituted payments made to Individual-1's according to the unwritten agreement to provide 40 percent of the ownership and/or profits of Company-2.

20. In December 2021, Individual-1's family and O'Quinns were in a dispute over the amount of money Individual-1's family were due according to the unwritten, agreement to provide 40 percent of the ownership and/or profits of Company-2. Individual-1's family informed Mabel O'Quinn that they believed they were owed an additional $800,000 in "equity payments" from beyond what Individual-3 and Individual-4 had received through MCKHU, Inc. and Frontline Source. On December 6, 2021, Individual-3 and Individual-4 sent an email to Mabel O'Quinn stating that she had accumulated $4,860,000 in equity in Company-2 while "MCKHU/Frontline" had accumulated only $4,016,000.

21. The December 6, 2021 email added that, "[W]ould you like to adjust your salary at all? It's always a balance of how much you want to keep in the company as retained earnings (equity) versus how much you would like to receive in your personal bank account now as salary." In the year 2020, Mabel O'Quinn declared a salary of Company-2 of $520,000 and total business equity as $1,449,000; in the year 2021, those two figures totaled $1,477,926; in the year 2022, those two figures totaled $1,937,034; and in 2023, those two figures totaled $2,585,900.

LA

22. Mabel O'Quinn forwarded the December 6, 2021 email to Individual-1 who responded, "oh my this is cash [Company-2' bookkeeper] did not say you have 800K on the [sic] books that is your take??" Mabel O'Quinn forwarded Individual-1's response to Rick O'Quinn by email.

23. In 2022, Company-2 paid an additional $426,750 to Frontline Source. In total, from 2019 to 2023, Company-2 paid $2,541,725 to Frontline Source. The O'Quinns directed these payments to Company-1 because Company-2 would not have been able to win certain prime contracts or subcontracts without Company-1 and Individual-1's support.

LAN

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, RICKY O'QUINN, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

*[signature]*
RICKY O'QUINN

I am Ricky O'Quinn's defense attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

*[signature]*
Larry Nathans, Esq.
Nina Ginsberg, Esq.
Attorney for RICKY O'QUINN